## FRANCIS P. NUGENT

*v.*

## THE JOHN McNEIL SHOE COMPANY.

[Filed December 2d, 1901.]

1. Where the mortgagor of a stock of shoes sold it to a company which took subject to the encumbrances, but did not assume the mortgage debt, it never became the personal obligation of the company so as to entitle the mortgagee to recover it from the company's receiver.

2. Where a partner continuing a shoe business gave a chattel mortgage to his late partner on the book accounts due to the dissolved firm, it imposed a lien on them, but not on the money collected on such accounts by a company which purchased the business from the mortgagor, the money being mixed with other money and used in the regular course of the company's business.

3. Where a continuing partner of a firm gave a chattel mortgage to the other partner, on the book accounts and afterwards sold the business to a company, the mortgagee is entitled to claim from its assets whatever the company collected on such accounts, as an unpreferred creditor, as for money received to his use.

4. Where a chattel mortgagee sold, under his mortgage, machines put on the premises by a purchaser of the business from the mortgagor, which were distinct from the property mortgaged, and capable of identification, he is answerable for their value.

---

*Mr. Malcolm McLear,* for the appellant.

*Mr. Charles M. Myers,* receiver, *pro se.*

STEVENS, V. C.

This is an appeal from the determination of the receiver of the shoe company. The case is submitted on an agreed state of

facts. It appears that the appellant, Bainbridge, and one John McNeil were partners in the shoe business. Bainbridge sold his interest therein to McNeil for $4,000. The payment of the money was secured by eight notes, made by McNeil, all bearing date on the day of sale, August 12th, 1898, and further secured by a chattel mortgage, in the usual printed form, in which McNeil bargained and sold, upon condition,

"all the goods and chattels mentioned in the schedule hereunto annexed and now in that part of the premises known as 236 Bank St., Newark, N. J., and occupied by me and also all goods and chattels that may in the future be brought into said premises to take the place of said goods and chattels now therein and all stock, shoes, &c., that in the future may be manufactured to take the place of the stock now therein and all book accounts."

The schedule refers, more particularly, to some of the goods on the premises, and concludes as follows: "And all book accounts now due the said firm of McNeil & Bainbridge now dissolved, and all book accounts in the future that grow due."

McNeil carried on the business on his own account from August 12th to August 24th, 1898. Then he transferred it to the John McNeil Shoe Company. Only one of the above-mentioned notes having been paid, a constable, on August 8th, 1899, at the instance of the mortgagee, seized the property of the shoe company, then on the premises 236 Bank street, and, on August 14th, sold it for the price of $556. This sum was credited on the mortgage debt.

On August 15th, 1899, the company was adjudged insolvent by this court and Mr. Myers was appointed receiver. Bainbridge presented his claim for the balance due on his mortgage ($2,942), and it was disallowed. From this disallowance the present appeal has been taken.

The debt was due, not from the company, but from McNeil. The company did not assume it, and so it never became its personal obligation. The case states only that "the business mentioned in the said conveyance was conveyed to the said corporation subject to the encumbrances thereon." Whatever claim, therefore, Bainbridge may have springs out of the lien created by his mortgage. He has no other claim, so far as the company

is concerned. Now, the case states that, on August 8th, 1899, Bainbridge, by his agent, the constable, seized all the personal property then on the premises No. 236 Bank street, and sold it. This, of course, exhausted his lien as to that. The company had, indeed, other tangible property on the premises 154 Market street, afterwards sold by the receiver, but upon that Bainbridge had no lien. The lien is carefully limited, both in the body of the mortgage and in the schedule annexed to it, to such property as was, or might be, brought upon the premises 236 Bank street.

Having thus exhausted his lien upon all the tangible property on which he had any lien, and having no personal (if I may use that term) claim against the company, what was left? There was left only his lien upon the book accounts. This lien, in terms, covered "all book accounts now due the said firm of McNeil & Bainbridge now dissolved, and all book accounts in the future that grow due." I think that this language is sufficiently explicit to impose a lien upon the book accounts then due the firm. It is not necessary to consider whether it was sufficient to create a lien upon the book accounts to grow due McNeil, for, as far as appears, there were no such accounts. The language did not, in terms, impose, and could not have imposed, a lien upon accounts which might have become due the company subsequently incorporated. *Kribbs* v. *Alford, 120 N. Y. 519.* What McNeil, by his contract, stipulated to give was a lien upon the then existing book accounts of the firm and such other book accounts as might thereafter arise in the conduct of his own business, not the business of anyone else. The case states that the amount paid in and collected by the corporation on these accounts was $3,235.85. But when they were settled and paid the lien was gone, unless it then fastened itself upon the money. On the facts agreed upon I think it impossible to assert that there was any lien upon the money, for this money was mixed with other money, and used in the regular course of the company's business. It could not be followed or identified. It could not be traced into any other specific property.

The important question is whether the company is accountable to the mortgagee for the money thus received; in other words, whether an action against the company for money had and re-

ceived to the use of the mortgagee could be maintained. Contrary to my first impression, I have come to the conclusion that it could be. The difficulty arises over the proper construction of the language of the mortgage. The scrivener used a printed blank, without considering very much whether its phraseology was adapted to the case of a continuing business. I think enough appears, however, to warrant an inference that the mortgagor had authority to sell the mortgaged property, in the usual course of trade, free from lien, and that the mortgagee would, as he lawfully might (*Lister* v. *Simpson, 11 Stew. Eq. 438; affirmed, 12 Stew. Eq. 595, 607*), look to the subsequently-acquired goods for his security. The language is that the mortgagor bargains and . sells

"the goods and chattels mentioned in the schedule   * .*   *   and also all goods and chattels that may in the future be brought into said premises *to take the place of said* goods and chattels now therein," &c.

If this were not the inference, as the mortgage was recorded, and as an inference of fraud, therefore, based upon continued possession by the mortgagor, was not possible, what was sold would have been sold subject to the mortgage—a result plainly contrary to the intention of the parties. On this construction, however, the infirmity of the security is evident. The mortgagor could, in the usual course of trade, have sold all the mortgaged stock, without being under any contract obligation to replace them. If he did, in fact, replace them, then, and only then, would there be any lien.

As the mortgagor was authorized to sell and collect and to use the proceeds of his sales and collections to buy new goods and continue the business, which, of course, would involve other disbursements, like wages, rent, &c., I think, if he did this, he could not be sued, either in trover or in an action on the case, for money had and received. He is liable, as at the beginning, on such personal security as he may have given the mortgagor, and his property is liable to the extent of the lien existing for the time being.

It would seem, at first blush, that as this was the situation of

the mortgagor, and as the mortgagor could dispose of his interest in the entire property, subject to the lien, without being guilty of any illegal act (*Woodside* v. *Adams, 11 Vr. 417, 428*), his vendee would stand in the vendor's shoes, and would have the same right to continue the business and to sell, in the usual course of trade, that the vendor had. He would, undoubtedly, if the mortgagee had authorized him to do so. Did he do so? The case shows that the mortgagee knew of the incorporation and of its object very shortly after it took place. He allowed the business to go on for a year, and he did not notify the debtors of the firm of the assignment of their book accounts to him. So far as his non-action has any significance, it is favorable to an inference of authority, and would probably prevent him from proceeding against those debtors who paid their debts to the corporation. *Miller* ads. *Pancoast, 5 Dutch. 250.* But I do not think that, as between mortgagee and vendee, with notice, the same implication can fairly be drawn as to the company's right to continue the business, to the prejudice to the mortgagee's lien, as was drawn in the case of the mortgagor. The right to continue is *only* an inference. This inference is based upon McNeil's agreement that the new stock and the new accounts which take the place of the old shall be subject to the lien. But the language of the mortgage does not extend the lien to the new stock and the new accounts of anyone but the mortgagor; and so, as to a stranger, the foundation for the inference fails, and we have merely the ordinary case of a recorded mortgage upon property assigned to another, of which that other has notice. On the authority of all the cases the purchaser who disposes of the mortgaged property, in defiance or exclusion of the rights of the mortgagee, is liable in an appropriate form of action. *Woodside* v. *Adams, 11 Vr. 429; Smithurst* v. *Edmunds, 1 McCart. 408.* I think, therefore, that the mortgagee is entitled to claim that whatever the company received on the property mortgaged, it received for his use, to the extent of the money now due. This claim is, of course, an unpreferred claim. It only entitles him to a share of the assets on an equality with the other unpreferred creditors.

It appears that among the tangible things sold by the mortgagee were some lasts and machines, or machinery, put upon the premises by the company. If these lasts and machines were capable of identification, and were separate and distinct from the property mortgaged, they did not become subject to the lien, and the mortgagee is answerable for their value.